```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: NOV 07 2007
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA           :  Criminal No.:

v.                                 :  **07 CRIM 1021**

MISTER A.C. LTD., and
MICHAEL C. VIGNOLA                 :  Violations:  15 U.S.C. § 1
                                                   18 U.S.C. § 371
         Defendants.               :

- - - - - - - - - - - - - - - - - - - - - - - - - x

JUDGE LYNCH

## INFORMATION

The United States of America, acting through its attorneys, charges:

1.  Michael C. Vignola ("Vignola") and Mister A.C. LTD., ("Mister A.C.") are hereby made defendants on the charge stated below.

### COUNT ONE -- SHERMAN ACT CONSPIRACY
(15 U.S.C. § 1)

#### I. THE RELEVANT PARTIES AND ENTITIES

During the period covered by this Count:

2.  Vignola resided in Rockville Centre, New York.

3.  Vignola was the 100% owner of Mister A.C.

4.  Mister A.C. was a New York corporation located in Rockville Centre, New York.

5.  Mister A.C. was engaged in the business of installing and repairing heating, ventilation and air conditioning systems ("HVAC"), with the Facilities Operations and

Engineering Department ("engineering department"), of New York Presbyterian Hospital ("NYPH").

6. NYPH has two locations and each location operates its own engineering department. The "downtown" engineering department location is at 525 East 68 Street, New York, New York, and the "uptown" engineering department location is at 627 West 165 Street, New York, New York.

7. "CC-1" was a co-conspirator purchasing official in the NYPH uptown engineering department who, among other things, selected the vendors to install and repair HVAC systems for the uptown location.

8. "CC-2," was a co-conspirator, who as an assistant to CC-1, and in that position, CC-2 had the ability to influence CC-1's selection of vendors, including vendors who installed and repaired HVAC systems for the uptown location. Subsequently, when CC-1 assumed another position at NYPH, CC-2 replaced him and assumed his purchasing official duties in the NYPH uptown engineering department.

9. "CC-3" was a co-conspirator who was an officer of one corporation that provided HVAC installation and repair services to NYPH. This corporation was located in Long Island City, New York.

10. "CC-4" was a co-conspirator who was an employee of one corporation that provided HVAC installation and repair services to NYPH. This corporation was located in Bayside, New York.

11. "CC-5" was a co-conspirator who was an employee of one corporation that provided HVAC installation and repair services to NYPH. This corporation was located in New York, New York.

12. Various other persons and firms, not made defendants herein, participated as co-conspirators in the offense charged herein and performed acts and made statements in furtherance thereof.

## II. BACKGROUND

13. Sometime in 2001, Vignola was introduced to CC-1 by CC-3. Subsequently, Mr. A.C. was pre-approved by CC-1 as the vendor to perform any emergency work at the uptown engineering department relating to HVAC systems. Mr. A.C. also performed non-emergency work that was awarded by a competitive bidding process by CC-1 and CC-2.

14. For non-emergency work, NYPH maintains a bidding policy to the effect that three bids shall be obtained for all purchases (a) where the value of a single item is over $5,000, (b) the value of a single purchase is over $10,000, (c) the annual value of a product, product line, or service is over $50,000, or (d) otherwise where competitive bidding would be advantageous. Specific exclusions to this policy are those instances where (a) an item is purchased through an available group purchasing agreement or contract/pricing agreement, (b) where an item is deemed to be a sole source purchase and there is adequate justification to be a sole source purchase, and (c) where there is no

known alternate source.

15.  The defendants and co-conspirators attempted to create the appearance that NYPH was awarding contracts, for non-emergency work, in compliance with its competitive bidding policy when, in fact, they frequently were not.

16.  Beginning in and around June 2002 and continuing until approximately January 2006, CC-1 and/or CC-2, at the NYPH uptown location, designated in advance that Mister A.C. would be the lowest bidder on certain contracts for the installation and repair of HVAC systems to NYPH. In order to create the illusion that these contracts had been awarded to Mr. A.C. in compliance with NYPH's competitive bidding policy, CC-1 and/or CC-2 told Vignola to obtain intentionally high, non-competitive complimentary bids from two others vendors. To comply with this request, Vignola would obtain two intentionally high, non-competitive bids from among CC-3, CC-4 and CC-5. At the time, Vignola provided kickbacks in the form of cash and gifts to CC-1 and CC-2. Vignola also subcontracted a substantial portion of the work it was awarded at NYPH through the bid rigging scheme to CC-3 through CC-5.

### III.  INTERSTATE TRADE AND COMMERCE

17.  Beginning in and around June 2002 and continuing until January 2006, pursuant to contracts that are the subject of this Count, NYPH purchased substantial quantities of HVAC services from the defendants and co-conspirators. The defendant purchased materials and equipment from manufacturers in states other than New York for

use in performing some of the aforementioned HVAC services.

18. The materials and equipment of the defendants and co-conspirators with respect to the aforementioned HVAC services provided to NYPH in connection with the contracts that are the subject of this Count, were within the flow of, and substantially affected, interstate trade and commerce.

19. During the period covered by this Count, the defendants and co-conspirators performed HVAC services pursuant to contracts that are the subject of this Count, and the materials and equipment that were used in performing these HVAC services for NYPH were produced in states other than New York and shipped across state lines in a continuous and uninterrupted flow of interstate commerce.

## IV. DESCRIPTION OF THE OFFENSE

20. Beginning in and around June 2002 and continuing until January 2006, the exact dates being unknown to the United States, in the Southern District of New York and elsewhere, the defendants and co-conspirators engaged in a combination and conspiracy in unreasonable restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

21. The aforesaid combination and conspiracy consisted of a continuing agreement, understanding, and concert of action among the defendants and co-conspirators, the substantial term of which was to rig bids for the installation and repair of HVAC systems provided to NYPH.

22.     For the purpose of forming and effectuating the aforesaid combination and conspiracy, the defendants and co-conspirators did those things which they combined and conspired to do, including, among other things:

a) CC-1 and/or CC-2, at the NYPH uptown location, designated in advance that Mister A.C. would be the lowest bidder on certain contracts for the installation and repair of HVAC systems to NYPH. In order to create the illusion that these contracts had been awarded to Mr. A.C. in compliance with NYPH's competitive bidding policy, CC-2 and/or CC-2, told Vignola to obtain intentionally high, non-competitive complimentary bids from two others vendors;

b) On those contracts for the installation and repair of HVAC systems requiring competitive bidding that CC-1 and/or CC-2 designated in advance that Mister A.C. would be the low bidder on, Vignola obtained two intentionally high, non-competitive complimentary bids from among CC-3, CC-4 and CC-5.

c) Vignola and CC-3 agreed that CC-3 would give Vignola intentionally high, non-competitive complimentary bids, which in turn, Vignola submitted to NYPH on behalf of CC-3, thus creating the illusion of a competitive bidding process at NYPH;

d) Vignola and CC-4 agreed that CC-4 would give Vignola intentionally high, non-competitive complimentary bids, which in turn, Vignola submitted to NYPH on behalf of CC-4, thus creating the illusion of a competitive bidding process at

NYPH;

e) Vignola and CC-5 agreed that CC-5 would give Vignola intentionally high, non-competitive complimentary bids, which in turn, Vignola submitted to NYPH on behalf of CC-5, thus creating the illusion of a competitive bidding process at NYPH;

f) Vignola paid cash and provided various gifts to CC-1 and CC-2, who were aware of and participated in the bid rigging scheme. These payments and gifts were provided at the request of CC-1 and CC-2 in order to ensure that the defendants received the HVAC installation and repair contracts and that potential competitors who were not co-conspirators would not be solicited by CC-2 and/or CC-2 to bid on such contracts and to frustrate and subvert NYPH's policy of seeking competitive bids for such contracts.

## V. JURISDICTION AND VENUE

23. The aforesaid combination and conspiracy was formed and carried out, in part, within the Southern District of New York within the five years preceding the filing of this Information.

IN VIOLATION OF TITLE 15, UNITED STATES CODE, SECTION 1


## COUNT TWO -- CONSPIRACY
(18 U.S.C. § 371)

### VI. THE RELEVANT PARTIES AND ENTITIES

The United States of America, acting through its attorneys, charges:

24.  Vignola is hereby made a defendant on the charge stated below.

25.  Paragraphs 2 through 12 of Count One of this Information are repeated, re-allege, and incorporated in Count Two as if fully set forth in this Count.

26.  "CC–6" was an employee of Mr. A.C.

### III. DESCRIPTION OF THE OFFENSE

27.  From at least as early as June 2001 and continuing until at least January, 2006, the exact dates being unknown to the United States, in the Southern District of New York and elsewhere, Vignola and his co-conspirators, and others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States of America, to wit, to violate Title 18, United States Code, Sections 1341 and 1346, in violation of Title 18, United States Code, Section 371.

28. It was a part and object of the conspiracy that Vignola, and others known and unknown, having devised and intending to devise a scheme and artifice to defraud NYPH, to obtain money and property from NYPH by means of false and fraudulent pretenses, representations, and promises, and to deprive NYPH of its intangible right to the honest services of its employees, unlawfully, willfully, and knowingly, for the purpose of

8

executing such scheme and artifice, would and did place in post offices and authorized depositories for mail matter, matters and things to be sent and delivered by the Postal Service, and deposit and cause to be deposited matters and things to be sent and delivered by private and commercial interstate carriers, and take and receive therefrom, such matters and things, and knowingly caused to be delivered by mail and such carriers according to the directions thereon, and at the place at which they were directed to be delivered by the persons to whom they were addressed such matters and things, in violation of Title 18, United States Code, Sections 1341 and 1346.

IV. THE MANNER AND MEANS BY WHICH THE CONSPIRACY WAS CARRIED OUT

The manner and means by which the conspiracy was sought to be accomplished included, among others, the following:

29. During all or some of the period between June 2001 and January 2006, Vignola paid kickbacks to CC-1 in the form of cash, electrical work done at CC-1's home and a jet ski with its trailer. CC-1 received kickbacks in the form of cash and goods and services totaling at least $90,000.00. Vignola paid kickbacks in the form of cash and goods and services to CC-1 in order to ensure that CC-1 would continue to allocate HVAC contracts at NYPH to Mr. A.C. Additionally, to conceal their receipt of payments and pre-arranged agreement to award HVAC contracts to the defendants, CC-1 would ask Vignola to provide other intentionally high non-competitive bids from other vendors, on certain, jobs, which frustrated and subverted NYPH's competitive bidding policy. In turn, Vignola

would obtain intentionally high non-competitive bids from CC-3 through CC-5 as described in paragraphs 22(c) through 22(e). As a result, NYPH was deprived of its right to the honest services of CC-1.

30. During all or some of the period between June 2001 and January 2006, Vignola would meet with CC-1 approximately 3 or 4 times a year at NYPH to discuss payment for work already performed by Mr. A.C. During these meetings CC-1 would write a dollar amount on a piece of paper and show it to Vignola. At the same time, CC-1 would tell Vignola "to get your paperwork in order." Vignola understood that CC-1 was asking for a kickback in the amount written on the piece of paper and that if he did not pay it he would no longer be awarded work at NYPH, and that payment on prior work would be delayed. This was confirmed to him by CC-3, who stated he also was paying kickbacks to CC-1 to obtain work. After these meetings, Vignola would obtain the requested sum in cash by either directly withdrawing it from Mr. A.C.'s corporate account, or by writing a check on Mr. A.C.'s corporate account to cash or to himself. He would then negotiate those checks to generate the cash to pay CC-1. At times, Vignola would personally deliver the cash to CC-1 at NYPH. On one occasion, Vignola made a payment of $10,000.00 to CC-1 on the Southern State Parkway in the presence of CC-3. On approximately two occasions CC-6, on behalf of Vignola, made the payments to CC-1 at NYPH. In addition to cash, CC-1 would also request that Vignola provide him free services and purchase merchandise for him. Vignola understood that if he did not provide the requested services and merchandise

CC-1 would no longer award Mr. A.C. work at NYPH, and that payment on prior work performed by Mr. A.C. would be delayed.

31.   During all or some of the period between June 2001 and January 2006, Vignola paid kickbacks to CC-2 in the form of cash, a used motorcycle, a Sony Play Station, a blackberry phone and free trips. CC-2 received kickbacks in the form of cash and goods and services totaling at least $41,000.00. Initially, CC-2 was CC-1's assistant, sometime thereafter, when CC-1 left his position, CC-2 assumed his duties. Vignola paid kickbacks in the form of cash and goods and services to CC-2 to ensure that CC-2 would intercede on his behalf with CC-1 in order to have CC-1 continue to allocate HVAC contracts to Vignola, and then, once CC-2 took over CC-1's position, Vignola continued to pay kickbacks in the form of cash or goods and services to CC-2 in order to ensure that CC-2 would continue to allocate HVAC contracts to Vignola and thereby continue to frustrate and subvert NYPH's competitive bidding policy for HVAC contracts. Also, CC-2 would ask Vignola to provide other intentionally high non-competitive bids from other vendors. In turn, Vignola would obtain intentionally high non-competitive bids from CC-3 through CC-5 as described in paragraphs 22(c) through 22(e). As a result, NYPH was deprived of its right to the honest services of CC-2.

32.   During all or some of the period between June 2001 and January 2006, CC-2 would either approach Vignola directly or through CC-6, and ask for cash or items of value. Vignola understood that CC-2 was asking for kickbacks and that if he did not pay it

11

he would no longer be awarded work at NYPH, and payment on prior work would be delayed. Vignola would obtain the requested sum in cash by either he, or CC-6, directly withdrawing it from Mr. A.C.'s corporate account, or by writing checks on Mr. A.C.'s corporate account to cash, or to Vignola or CC-6, which Vignola, or CC-6, would then negotiate the checks to generate the cash to pay CC-2. Vignola, or CC-6, would then personally deliver the cash to CC-2 at NYPH. In addition to cash, CC-2 would also ask Vignola directly, or through CC-6, to provide him free trips and purchase merchandise for him. On one occasion, CC-2 asked CC-6 to give him a motorcycle owned by CC-6, and CC-6, with Vignola's knowledge, complied with this request. Vignola understood that if he did not provide the requested trips and merchandise, CC-2 would no longer award work to Mr. A.C. at NYPH, and payment on prior work performed by Mr. A.C. would be delayed.

33.  At no time did Vignola or his co-conspirators disclose to NYPH Vignola's or CC-6's payments to CC-1 and CC-2. All such payments were made without the knowledge or approval of NYPH, and in violation of CC-1's and CC-2's duty of loyalty to NYPH.

## V. OVERT ACTS

34.  In furtherance of the conspiracy, and to effect the illegal objects thereof, the defendant and others known and unknown, committed the following overt acts, among others, in the Southern District of New York, and elsewhere:

(a) On numerous occasions, between approximately June 2001 and January 2006, Vignola and his co-conspirators caused NYPH to issue numerous purchase orders to Mr. A.C. Some of these purchase orders were sent through the United States mails from NYPH's offices in the Southern District of New York to the office of Mr. A.C.;

(b) On numerous occasions, between approximately June 2001 and January 2006, Vignola and his co-conspirators caused Mr. A.C. to issue numerous invoices to NYPH. Some of these invoices were sent through the United States mails to NYPH's offices in the Southern District of New York;

(c) On numerous occasions, between approximately June 2002 and January 2006, Vignola and his co-conspirator caused CC-3 through CC-5 to issue numerous false and fraudulent bids. Some of these bids were sent through the United States mails to NYPH's offices in the Southern District of New York;

(d) On numerous occasions, between June 2001 and January 2006, Vignola and his co-conspirators caused NYPH to issue checks to Mr. A.C. Some of these checks were sent through the United States mails from NYPH's offices in the Southern District of New York to the office of Mr. A.C.;

(e) On numerous occasions, between June 2001 and January 2006, Vignola paid numerous kickbacks to CC-1 and CC-2 in the form of cash and goods and services in order to obtain contracts for the installation and repair of HVAC systems at NYPH.

IN VIOLATION OF TITLE 18, UNITED STATES CODE, SECTION 371.

Dated: November 7, 2007

THOMAS O. BARNETT
Assistant Attorney General

SCOTT D. HAMMOND
Deputy Assistant Attorney General

MARC SIEGEL
Director of Criminal Enforcement
Antitrust Division
U.S. Department of Justice

MICHAEL J. GARCIA
United States Attorney
Southern District of New York

RALPH T. GIORDANO
Chief, New York Office

STEPHEN J. McCAHEY

DEBRA C. BROOKES

JEFFREY D. MARTINO
Attorneys, Antitrust Division
U.S. Department of Justice
26 Federal Plaza, Room 3630
New York, New York 10278
(212)264-0656

14